# In the United States Court of Federal Claims

### No. 15-119C
### (Bid Protest)
### (Filed: July 14, 2015) [1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | Post-award Bid Protest; 28 U.S.C. |
| A-T SOLUTIONS, INC., | * | § 1491(b)(1); Transition Plan Feasibility; |
| | * | Cost Evaluation; Cost Realism Analysis; |
| Plaintiff, | * | FAR 15.404-1; Technical Evaluation; |
| | * | Adjectival Ratings; Unequal Treatment; |
| v. | * | Best Value Determination. |
| | * | |
| THE UNITED STATES, | * | |
| | * | |
| Defendant, | * | |
| | * | |
| and | * | |
| | * | |
| CUBIC APPLICATIONS, INC., | * | |
| | * | |
| Intervenor. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |

J. Alex Ward, Damien C. Specht, Ethan E. Marsh, Jenner & Block LLP, 1099 New York Avenue, NW, Suite 900, Washington, D.C. 20001, for Plaintiff.

Benjamin Mizer, Robert E. Kirschman, Jr., Steven J. Gillingham, and James Sweet, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

Paul F. Khoury, Wiley Rein LLP, 1776 K Street, NW, Washington, D.C., for Intervenor. Tracye Winfrey Howard and Nina Rustgi, Wiley Rein LLP, 1776 K Street, NW, Washington, D.C. 20006, Of Counsel.

---

[1]     The Court issued this opinion under seal on June 29, 2015, and directed the parties to file proposed redactions by July 15, 2015.  The Court publishes this Opinion indicating redactions by asterisks "[***]."

---

## OPINION AND ORDER

---

**WILLIAMS**, Judge.

This post-award bid protest comes before the Court on the parties' cross-motions for judgment on the Administrative Record ("AR"). Plaintiff, A-T Solutions ("A-TS"), challenges the Defense Threat Reduction Agency's ("DTRA") award of a contract to the incumbent Cubic Applications, Inc. ("Cubic") for the development and implementation of training programs to counter threats from chemical, biological, or nuclear attacks or accidents. Plaintiff challenges DTRA's evaluation of Cubic's proposed transition costs and staffing, and the assignment of strengths and weaknesses to Cubic's and A-TS' proposals. Plaintiff requests that the Court declare the award unlawful and permanently enjoin DTRA from performing the contract until the Agency reopens the procurement and makes a new award. For the reasons that follow, the Court denies the protest.

## Findings of Fact[2]

### DTRA's Issuance of Solicitation No. HDTRA1-14-R-0003

The mission of DTRA is to "safeguard America and its allies from weapons of mass destruction (WMDs), specifically chemical, biological, radiological, nuclear, and high-yield explosives (CBRNE) threats." AR 152. DTRA provides the military, federal agencies, and foreign allies with training to reduce and counter threats from chemical, biological, and nuclear attacks or accidents. Id. DTRA's Building Partnership Capacity Department ("J3BP") "institutionalizes training and concepts of operations," "promotes counter WMD awareness" and works to establish, test, and improve "both U.S. and foreign counter CBRNE and nuclear surety capabilities, policies and procedures . . . ." Id.

On January 31, 2014, DTRA issued solicitation number HDTRA1-14-R-0003 for "technical, logistical, operational, training, and all associated ancillary support required to develop, perform, and execute the J3BP Department's counter CBRNE Exercise, Training, Capability Assessment & Development mission sets." Id. DTRA anticipated awarding one indefinite delivery, indefinite quantity ("IDIQ") contract and then issuing cost-plus-fixed-fee task orders. AR 232, 234.

The solicitation included three Sample Task Orders to be evaluated and awarded. The contract had a five-year ordering period and an additional five-year option period. AR 2519. The anticipated award date of the IDIQ contract was no later than September 5, 2014, with Sample Task Orders 1 and 3 to be awarded within two business days of contract award and Sample Task Order 2 to be awarded by December 2014. Id. Each Sample Task Order was split into CLINs 0001 and 0002. CLIN 0001 was for a 60-day transition period from September 17,

---

[2]   These findings of fact are derived from the AR. Additional findings of fact are in the Discussion.

2014 to November 16, 2014.  Id.  CLIN 0002, which called for the performance of three Sample Task Orders, was to commence on November 16, 2014.  Id.

Sample Task Order 1 was for the development and implementation of training programs to improve the consequence management capabilities of United States partner nations "during the early phases of a CBNR incident . . . ."  AR 250.  Sample Task Order 2 was for the development and implementation of training programs to counter the threat of international proliferation of weapons of mass destruction.  AR 283.  Sample Task Order 3 was for the development and implementation of joint training exercises to improve United States and partner nation responses to nuclear accidents or incidents. AR 336.  In the solicitation, the statement of work for each Sample Task Order included transition work, stating:

> During the period September 17, 2014 through November 16, 2014, the contractor shall provide any and all transition support required during the 60 day transition period that may be required. Any and all transition costs shall be proposed and accumulated discretely under CLIN 0001 only.

AR 251, 284, 338.

The contract was to be awarded on a best value basis using three factors: mission capability, past performance, and cost.  AR 236.   Mission capability was more important than past performance, which was more important than cost.   Id.   Mission capability included Subfactor A – Management Approach and Subfactor B – Technical Approach.  Id.  The two subfactors under mission capability were of equal importance and mission capability combined with past performance was significantly more important than cost, although cost was to be "carefully considered."  Id.

DTRA was to evaluate Subfactor A based on offerors' "comprehensive Management Approach," which defined and detailed how offerors would perform the contract requirements. AR 237.  Subfactor B required offerors to submit a comprehensive Technical Approach that defined, detailed, and demonstrated offerors' technical understanding and approach to executing the SOW for each Sample Task Order effort.  AR 238.  Each technical approach was to include Transition, Execution, and Staffing Plans.  Id.  The Staffing Plan had to correspond to the Execution Plan and demonstrate that the proposed personnel possessed the required skills.  Id.

The solicitation included DTRA's estimates of the staffing levels needed to perform each Sample Task Order, expressed as a number of Full Time Equivalents ("FTEs").  One FTE was the equivalent of 1,880 hours per year.  Each Sample Task Order's statement of work ("SOW") expressly advised Offerors that they "[were] not required to utilize the Government provided FTE estimates."  See AR 251, 284, 338.  The SOW further informed offerors that the estimated FTEs were "provided for pricing purposes only and [would] be deleted from the SOW upon Task Order award."  AR 251, 284, 338.

In terms of cost, DTRA would

> evaluate the realism of the proposed cost/price by assessing whether the proposed cost elements for each Sample [Task Order] and transition plan 1) [were] realistic for the work to be performed; 2) reflect[ed] a clear understanding of the requirements; and 3) [were] consistent with the unique methods of performance

3

identified in the Offeror's Technical Approach Execution Plan and priced with the identical quantity and labor mix of personnel identified in the Technical Approach Staffing Plan.

AR 243.   The Government was to evaluate each offeror's cost proposal for "realism, reasonableness, and completeness."  Id.  As part of its cost evaluation, DTRA would determine the most probable cost "by adjusting the Offeror's proposed cost and fee, when appropriate, to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis."  Id.

### Proposals

DTRA received proposals from A-TS, the incumbent Cubic, and three other offerors.  A-TS and Cubic proposed the following FTE levels as compared to DTRA's estimates:

|  | A-TS FTE | Cubic FTE | Agency Estimate FTE |
|---|---|---|---|
| **Sample Task Order 1** | [***] | [***] | 36 |
| **Sample Task Order 2** | [***] | [***] | 17.8 |
| **Sample Task Order 3** | [***] | [***] | 29.5 |

AR 1697, 1779, 1835; AR 2934-35; AR 423, 284, 457.

In its cost section, Cubic described its efforts to reduce costs, including proposing no cost for transition.  AR 1998.  For CLIN 0001, the transition CLIN, for each Sample Task Order, Cubic proposed zero hours and zero cost.  See AR 2453.  In its cost proposal, Cubic stated that "the efforts required during the transition period will be performed by employees assigned to our indirect rate pools."  AR 2009.  In its Management Approach section, Cubic described its transition plan and identified which employees would be involved and what their roles would be.  AR 1652-55.  In its technical proposal, Cubic described how it would implement the transition for each Sample Task Order, including the role and tasks of management employees.  AR 1686, 1768-69, 1827-29.  Furthermore, Cubic represented that its corporate structure assigned "most incumbent transition tasks to [its] overhead organization."  AR 1687.

### Proposal Evaluation and Award

The Source Selection Evaluation Board ("SSEB") contained a three-member Mission Capability Evaluation Team, a two-member Past Performance Risk Assessment Group, and a three-member Cost Evaluation Team.  AR 2524. The SSEB applied the definitions of strengths and weaknesses set forth in the solicitation.  The SSEB evaluated not only each strength or weakness, but also "the benefit of the strength to the Government or the impact of the weakness on performance."  AR 2533.   The SSEB used the following ratings, as set forth in the solicitation:

Significant Strength: An aspect of an Offeror's proposal that has substantial merit or substantially exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance.

Strength: An aspect of an Offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance.

Significant Weakness: A flaw in the proposal that appreciably increases the risk of unsuccessful contract performance.

Weakness: A flaw in the proposal that increases the risk of unsuccessful contract performance.

AR 2533.

In assessing risk, the Government considered the degree to which an offeror's proposed approach might cause "a disruption of schedule, increased costs, degradation of performance, need for increased Government oversight, or the likelihood of unsuccessful contract performance." Id.

As required by the solicitation, the SSEB used the following adjectival ratings:

Outstanding: Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low.

Good: Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low.

Acceptable: Proposal meets requirements and indicates an adequate approach and understanding of requirements. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is no worse than moderate.

Marginal: Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high.

Unacceptable: Proposal does not meet requirements and contains one or more deficiencies. Proposal is not awardable.

AR 2534.

The parties received the following ratings for Subfactor A – Management Approach:

|  | Rating | Significant Strengths | Strengths | Weaknesses |
|---|---|---|---|---|
| **A-TS** | Good | 2 | 2 | 0 |
| **Cubic** | Good | 1 | 2 | 0 |

AR 2575-77, 2610-11.

5

For Subfactor B – Technical Approach, Cubic received an "outstanding" rating overall and the following number of strengths and weaknesses:

**Cubic**

|  | Significant Strengths | Strengths | Weaknesses |
|---|---|---|---|
| **Sample Task Order 1** | 2 | 0 | 2 |
| **Sample Task Order 2** | 3 | 1 | 0 |
| **Sample Task Order 3** | 3 | 0 | 0 |

AR 2578-87.

For Subfactor B – Technical Approach, A-TS also received an "outstanding" rating overall and the following strengths and weakness:

**A-TS**

|  | Significant Strengths | Strengths | Weaknesses |
|---|---|---|---|
| **Sample Task Order 1** | 3 | 3 | 1 |
| **Sample Task Order 2** | 1 | 2 | 3 |
| **Sample Task Order 3** | 2 | 3 | 1 |

AR 2612-25.  For the past performance factor, both A-TS and Cubic received the highest "substantial confidence" rating.  AR 2702.

Cubic and A-TS submitted the following prices, as compared to the IGCE:

|  | Sample Task Order 1 | Sample Task Order 2 | Sample Task Order 3 | Total |
|---|---|---|---|---|
| **Cubic** | [***] | [***] | [***] | [***] |
| **A-TS** | [***] | [***] | [***] | [***] |
| **Independent Government Cost Estimate** | [***] | [***] | [***] | [***] |

AR 2709.

6

The Government conducted a price analysis and determined that adequate price competition established price reasonableness, as there were five offerors. AR 2709-10. For each offeror, the Government also performed a cost realism analysis to determine whether the proposed cost elements were realistic for the work to be performed, consistent with the offeror's technical proposal, and reflected a clear understanding of the requirements. AR 2711. Although the Government could have determined a "most probable cost" for each proposal by "adjusting each offeror's proposed cost and fee to reflect any additions or reductions in cost elements," it did not make any adjustments to either Cubic's or A-TS' cost proposal and found that both proposals were realistic. AR 2712, 2726, 2738.

The 11-member Source Selection Advisory Council ("SSAC") created a Comparative Analysis Report, determined that the SSEB's evaluation was proper, and agreed to recommend award to Cubic without discussions. AR 2755, 2760. The SSAC agreed that both Cubic and A-TS merited a "good" rating for Subfactor A – Management Approach as both had a "thorough approach and understanding of the requirements," and that both Cubic and A-TS merited an "outstanding" rating for Subfactor B – Technical Approach because they demonstrated an "exceptional approach and understanding of the requirements." AR 2763-65. The SSAC unanimously concurred with all of the SSEB's findings on price. AR 2767-69. The SSAC found that

> [b]ased on the costs of the two essentially equally rated offers, Cubic and A-T Solutions, . . . the [***] higher proposed cost of A-T Solutions was not offset by the proposed technical benefits.

AR 2770. A-TS' price was [***] higher than Cubic's. AR 3372.

On June 23, 2014, the Source Selection Authority ("SSA") issued his Source Selection Decision Document. AR 2775-77. In this decision, the SSA determined that Cubic's "proposal provide[d] the best overall value to satisfy the requirements of [DTRA]." Id. The SSA stated:

> Utilizing the results of the evaluation conducted by the SSEB, the strengths and weaknesses outlined in that evaluation, and the SSAC Comparative Analysis Report, I have conducted an integrated assessment of the proposals using the criteria and order of importance established in Section M of the RFP. As evidenced in the evaluation results, Cubic Applications, Inc. provided the overall best value to meet the Government's requirements.

> In the final analysis, Cubic Applications, Inc. and A-T Solutions were determined to be essentially equal for Mission Capability with a Good for Management Approach and Outstanding for Technical Approach. Both companies also received a rating of Substantial Confidence regarding past performance. However, the Cubic proposal was approximately [***] less than A-T Solutions. The difference in estimated cost is not overcome by any other factors.

AR 2776-77. The SSA thus decided to award the contract to Cubic without discussions, and award was made on July 23, 2014. AR 2777.

**A-TS' GAO Protest**

On August 4, 2014, A-TS filed a protest before the Government Accountability Office ("GAO").  A-TS' grounds of protest were very similar to those raised here, specifically that DTRA failed to appreciate the risk of Cubic's low staffing and that it failed to properly assign strengths and weaknesses to the Cubic and A-TS proposals. AR 2928-29.  GAO held an outcome prediction conference on October 31, 2014, and opined that the protest would be sustained for two reasons – 1) DTRA's assignment of a weakness to A-TS for proposing individuals whose hours exceeded those of a Full Time Equivalent, but not to Cubic, which also proposed individuals in excess of a Full Time Equivalent and, 2) DTRA's improper award of a strength to Cubic for purchasing non-refundable airline tickets, as this was required of all contractors. AR 3287.  On November 3, 2014, the Agency decided to take corrective action and reevaluate this weakness and strength, "[r]econsider the overall evaluation of offerors based on any revisions to the mission capability evaluation of offerors," "reconsider the award decision based upon the reevaluated strengths and weaknesses," and "[i]ssue a new award decision." AR 3287-88.

**DTRA's Corrective Action**

The chair of the SSEB issued a new document containing "Post-Protest Source Selection Evaluation Board Results" on November 13, 2014.  AR 3294. The SSEB removed the strength that Cubic had received for Sample Task Order 2 related to the non-refundable airline tickets. AR 3320.  For A-TS, the SSEB removed one weakness and "reworded" another weakness.[3]  AR 3332.  The removed weakness, for Subfactor B – Technical Approach in Sample Task Order 2, stated "Offeror has one individual whose hours exceed 1 FTE (352 for CLIN 1; 1880 for CLIN 2) without explanation ([Sample Task Order] 2 – page 52)." AR 3340.  A-TS' original weakness was for Subfactor B – Technical Approach in Sample Task Order 3 and similarly stated:

> Offeror has one individual whose hours exceed 1 FTE (352 for CLIN 1; 1880 for CLIN 2) without explanation ([Sample Task Order] 3 – page 59).

AR 3345.  The impact/risk of the original weakness was listed as "Government is uncertain why one individual is exceeding 1 FTE hours." Id.

As part of its corrective action, DTRA did not remove this weakness and restated it as follows:

> Offeror provided an inconsistent staffing plan for Transition. The Senior Exercise Planner is proposed to work 544 hours during transition (page 194 para 1.1 Transition) however, in Exhibit 73 (page 167) the Senior Exercise Planner is not identified and instead the hours are divided between Program Analysts.

AR 3346.  DTRA assessed the new impact/risk of this reworded weakness as follows:

> [b]ecause of the inconsistency in the proposal the Government doesn't understand the transition staffing and [sic] proposed transition tasks would be accomplished.

---

[3]     Although DTRA characterized this weakness as having been "reworded," Plaintiff disputes this and contends that DTRA actually created a new weakness.  See AR 3332.

Id.

On January 17, 2015, the SSA issued a new Source Selection Decision Document, noting that no changes were made to Cubic's or A-TS' Subfactor A – Management Approach, and thus both retained a "good" rating.  AR 3369, 3373.  The SSA stated that the removal of Cubic's strength for non-refundable airline tickets was "insignificant and did not impact the original evaluation results," and that Cubic's Subfactor B – Technical Approach rating remained "outstanding."  AR 3369.  The SSA also addressed the SSEB's and SSAC's revised statements of A-TS' weaknesses.  The SSA noted that the SSEB determined that the removal of one weakness and the "rewording" of another "were insignificant to the overall findings and did not impact the original evaluation results." AR 3369-70.  The SSA stated that Cubic's and A-TS' Subfactor A and B proposals were roughly equivalent.  AR 3370. The SSA added a new assessment of the relative best value of the proposals of A-TS and Cubic, stating that he was particularly impressed by Cubic's experience doing business in over 85 countries and Cubic's pre-engagement strategy for each Sample Task Order.  Id.

The SSA noted that the Contracting Officer "did a verification of the proposed costs to ensure [there were] no changes to the evaluation during the delay associated with the protest and verified the original costs were complete, reasonable and realistic."  AR 3371.  The SSA continued:

> Cubic's labor rates were higher than [A-TS']; however Cubic offered to do the work with fewer hours through an efficient approach. Cubic proposed [***], which provided an exceptional process to support Government surge requirements and a thorough approach to support international logistics and an exceptionally through [sic] understanding of the technical requirements.  [A-TS'] proposal also provided a large skill pool complimented by both full time and part time positions, and cross-functional area qualified instructors with teaching credentials, however the benefits to the Government did not outweigh the approximately [***] additional cost.  As noted before, both Cubic and [A-TS] were judged essentially equal on the Mission Capability Factor; Subfactor A – Management Approach (both GOOD/PURPLE) and Mission Capability Subfactor B – Technical Approach (both OUTSTANDING/BLUE).

> In analyzing the costs, it was noted that about [***] of Cubic's [***] in lower costs were attributable to reduced labor hours. The balance of the difference (in Cubic's favor) were associated with the fringe, labor overhead, G&A, materials handling, and their fixed fee. The lower Cubic rates in fringe, labor overhead, G&A, materials handling, and fixed fee will benefit the Government on future task orders.

> The nearly [***] would be an immediate savings. However, the approximately [***] in savings could be extrapolated for the life of the contract. By selecting Cubic, the Government, in theory, would be obtaining [***] more effort than [A-TS] over the five year period of performance.

AR 3372.  The SSA determined that it was in the Government's best interest to award the contract to Cubic without discussions.  AR 3373.

The GAO dismissed A-TS' protest on November 3, 2014, due to DTRA's decision to take corrective action.  AR 3366.  After the SSA issued his post-GAO protest Source Selection Decision on January 7, 2015, A-TS filed the instant protest on February 6, 2015.  The Government voluntarily stayed award until June 30, 2015.  Compl. ¶ 4 n.1.

## Discussion

### Standard of Review

The Court evaluates bid protests pursuant to the Administrative Procedure Act's standard of review for an agency action.  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  This Court will not disturb an agency's procurement decision unless the Court finds that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012); Adams & Assocs. v. United States, 741 F.3d 102, 105-06 (Fed. Cir. 2014). The Court will set aside an agency's decision as arbitrary and capricious if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Ala. Aircraft Indus., Inc. v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). The Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).  The Court will not overturn an agency decision "even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations" if the Court finds a reasonable basis for the agency's action. Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

If this Court finds that the agency acted arbitrarily or capriciously or contrary to law, the plaintiff must also show that it was prejudiced by this conduct to prevail. Bannum, 404 F.3d at 1351. The plaintiff must show that there was a "substantial chance" the plaintiff would have received the contract award but for the Government's errors in the procurement process. Id. at 1358. Under Rule 52.1, the parties are limited to the AR, and the Court makes findings of fact as if it were conducting a trial on a paper record.  See id. at 1356.  Looking to the AR, the Court must determine whether a party has met its burden of proof based on the evidence in the record. Id.

### DTRA Correctly Evaluated Cubic's Staffing

A-TS challenges DTRA's evaluation of Cubic's staffing in two respects – its evaluation of Cubic's Technical Approach and its cost realism analysis.  As to the Technical Approach, A-TS asserts that "the record contains no documents" showing that DTRA "determined that Cubic could perform the Sample Task Orders with just [***] percent of the Government's staffing estimate."  Pl. Mot. 17-18.  A-TS also takes issue with the post-protest Source Selection Decision claiming that the SSA did not specifically acknowledge that Cubic's proposed staffing was "sharply lower than the Government estimate."  Id. at 18-19. Finally, A-TS contends that

DTRA's technical evaluation was arbitrary and capricious because it did not contain a "coherent and reasonable explanation" of DTRA's exercise of discretion.  Id. at 19-20.

Plaintiff's efforts to undermine the technical evaluation fail.  The record contains ample documentation demonstrating that Cubic's lower staffing was fully disclosed by Cubic and understood by the Agency.  Cubic not only put the Government on notice that it planned to use lower staffing levels than the Agency estimate, it touted that approach as a cost savings measure. The solicitation did not require offerors to propose a minimum number of FTE to be responsive, or to explain any variation from the Agency's estimated FTE levels.  Rather, offerors were free to utilize their manpower as they saw fit to complete the Sample Task Orders.

In its proposal for each Sample Task Order, Cubic detailed how it had arrived at its proposed staffing levels based on historical performance data, including a table of such data over different months in 2012 and 2013, for Sample Task Orders 1 and 3.  AR 1697, 1835.  Cubic not only explained its approach in its narrative, it depicted its staffing graphically.  For each Sample Task Order, Cubic included a graph showing how its specified number of employees assigned to a given task would vary by month, representing "how the Cubic Team [would] support the [Task Order] execution with significantly less FTEs than the Government estimate."  Id.  Cubic represented that it would be able to keep its core staff to a minimum, as it had done over the last 10 years.  Id.

Cubic's Execution Plan detailed how it would perform each Sample Task Order with the number of employees that it proposed.  See AR 1684-1748; 1762-1817; 1824-87.  For example, Cubic provided a Staffing Plan that listed over 60 of its and its subcontractor's employees and cross-referenced their work with the requirements of the solicitation's SOW for Sample Task Order 1.  AR 1724-25.  Similarly, Cubic's proposal for Sample Task Orders 2 and 3 detailed the anticipated roles of numerous identified employees in completing the contract tasks.  See AR 1762-1817; 1824-87.

Contrary to Plaintiff's contention, not only did Cubic highlight that it would use less staffing, but the SSA also clearly articulated his understanding that Cubic would expend fewer hours to perform.  In his second Source Selection Decision Document, the SSA stated:

> Cubic's labor rates were higher than [A-TS']; however Cubic offered to do the work with fewer hours through an efficient approach. Cubic proposed [***], which provided an exceptional process to support Government surge requirements and a thorough approach to support international logistics and an exceptionally through [sic] understanding of the technical requirements.

AR 3372.

Nor has Plaintiff established that DTRA failed to rationally explain its award to Cubic. This was a best-value procurement.  The SSA's post-GAO protest Source Selection Decision set forth elements of Cubic's proposal that he found valuable, including Cubic's international presence and Cubic's pre-engagement strategy on Sample Task Order 1.  AR 3370.  He concluded that while A-TS' and Cubic's Technical Approaches were roughly equivalent in merit, Cubic had an exceptionally thorough understanding of the technical requirements, and an "efficient approach" that allowed it to do the work using fewer hours, providing the Government

with a cost savings of almost [***].   AR 3372.   In sum, Plaintiff's challenges to DTRA's technical evaluation of staffing and the award to Cubic are not supported by the record.

### The Cost Realism Analysis Was Reasonable

Second, A-TS argues that DTRA failed to properly conduct a cost realism analysis and "did not adjust Cubic's proposed costs to account for its low staffing levels."   Pl. Mot. 22. According to A-TS, the Agency should have adjusted Cubic's proposed costs to reflect the insufficient staffing levels it proposed.   Id.   This, A-TS contends, would have forced the Agency to add additional hours to Cubic's proposed staff levels, therefore significantly increasing Cubic's costs.   Id.

As cost realism determinations are within an agency's "sound discretion and expertise," the Court will not overturn a cost realism determination unless the plaintiff demonstrates the absence of a rational basis for the agency's decision.   CTA Inc. v. United States, 44 Fed. Cl. 684, 693 (1999).   It is unnecessary for an agency to demonstrate that a required cost realism analysis was conducted with "impeccable rigor."   OMV Med. Inc. v. United States, 219 F.3d 1337, 1334 (Fed. Cir. 2000).   In performing a cost realism analysis, an agency independently reviews and evaluates the elements of an offeror's proposed cost estimate "to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal."   48 C.F.R. § 15.404-1.   Agencies are required to do more than merely state that a cost realism analysis was performed.   Cohen Fin. Servs., Inc. v. United States, 110 Fed. Cl. 267, 286-87 (2013).

Plaintiff's cost realism argument is predicated on its erroneous assumption that Cubic's staffing levels were too low and had to be adjusted upward with a concomitant increase to Cubic's price.   This construct is flatly wrong as explained above.   While Cubic's staffing levels were lower than A-TS' and the Government estimate, the Agency reasonably determined that they were not too low, and there is no basis for the Court to impose the so-called cost realism adjustment Plaintiff proposes.   See AR 2726, 3366.   DTRA had a rational basis for concluding that Cubic's staffing proposal met the requirements of the solicitation and that Cubic's cost proposal was realistic.   A-TS' contention that DTRA should have adjusted Cubic's costs is without merit.[4]

---

[4]   A-TS also speculates that the Agency misunderstood Cubic's [***] in evaluating its lower FTEs.  Pl. Mot. 19.  A-TS presumes that the staffing difference between the Government's FTE estimates and Cubic's proposal was due to Cubic cutting hours for management and support.  Pl. Reply 10.  Using Sample Task Order 2 as an example, A-TS posits that because [***] Cubic's proposal should have had less hours for these roles, not more, if the lower staffing levels in its proposal were truly due to [***].  Id.  A-TS' unproven assumptions do not provide a basis to substitute A-TS' purported evaluation for that of the Agency.

**DTRA's Technical Evaluation of Cubic's Transition Plan Was Reasonable**

A-TS also claims that the Agency failed to evaluate whether Cubic's transition plan was technically feasible.  Pl. Mot. 9.   A-TS contends that Cubic's transition plan generated inconsistencies that were not addressed by the Source Selection Board, making it unclear whether Cubic's proposed transition plan was technically feasible.  Specifically, A-TS asserts that, in its transition plan, Cubic assigned its incumbent employees to work on two contracts at the same time -- the incumbent contract and the new award -- and committed direct staff to work on the new contract's transition CLINs, while claiming that transition tasks would be performed only by indirect staff.  Id. at 11-12.

Cubic's technical proposal described its transition plan as follows:

Detailed transition planning is critical to a smooth transition of personnel, execution tasks, and material from the current contract to this new task order (TO).  We acknowledge that this is a new contract with new contractual requirements and CDRLs.  The program's transition period from 17 September to 16 November 2014 corresponds to the end of our current incumbent task order period of performance.

We will continue to execute all technical tasks on the current contract through the transition period. Our Corporate overhead staff will complete all security, contractual, and HR requirements associated with the new contract prior to 16 November. Our approach ensures no disruption to existing services and the smooth implementation of new services and contract options. Performing the majority of our work now, our approach keeps our Country Leads and currently assigned staff focused on supporting their assigned operations, while our leadership team and support staffs focus on transitioning to the new task order contract vehicle. This approach ensures continuity of operations and a successful transition.

AR 1686.

A-TS argues that Cubic assigned its incumbent employees to work on two contracts at once because, in its Management Approach, Cubic stated that the incumbent Program Managers were "fully vested in their respective programs" yet also described these individuals as working on the transition to the new contract.  Pl. Mot. 11-13; AR 1654.   A-TS attempts to divine an inconsistency where none exists.  Cubic's proposal did indicate that managers would be working both on the incumbent contract and on overseeing the transition.  However, it is not inconsistent for managers to be "fully vested" in their respective programs and oversee transition – it is a sound business judgment to use managers with program experience to ensure a smooth 60-day transition.[5]  Much of A-TS' complaint here can be attributed to Cubic's status as the incumbent, but neither this reality nor Cubic's proposed transition gives rise to A-TS' suggested inconsistency.

---

[5]      Because Cubic is not charging any costs for transition to its new contract, there is no risk that the Government is paying too much for this effort.

A-TS also asserts that the assignment of transition tasks to direct management personnel was at odds with Cubic's assertion that its corporate overhead staff would "complete all security, contractual, and HR requirements" associated with the new contract. Pl. Mot. 11-13; AR 1686. A-TS ignores that Cubic described how the transition would be managed by a specified team of employees and how its corporate overhead staff would complete other activities. AR 1686-89. Cubic represented that its corporate structure assigned "most incumbent transition tasks to [its] overhead organization." AR 1687 (emphasis added). In its proposal, Cubic broke transition down into transition management and staffing. For Sample Task Order 1, the management section stated that transition would be done "under the guidance" of [***].[6] AR 1686. [***], Cubic's Program Manager, was tasked with the "overall responsibility to plan, organize, direct and control the transition" and would work with [***], the Deputy PM, to "manage the development and updating of team procedures and team training requirements." Id. Cubic also identified "key participants in management transition" as the "[CBRN Preparedness Program] Coordinator," the "Country Leads," and "selected members" of a subcontractor's "logistics support team." Id. In the staffing section, Cubic proposed that incumbent staff who were engaged in the "planning, execution or after-action phases on the current contract" would not be switched to the new contract until day one of the new performance period. AR 1687.

Here, DTRA reasonably accepted Cubic's detailed transition plan. The solicitation did not break out what specific tasks had to be done for transition. Instead, it required that offerors provide transition plans that would:

> [S]pecifically define, detail, and demonstrate all aspects of ramp-up including transition risks with mitigation strategies and staffing schedules, training and data capture for all prime and subcontracted efforts as necessary . . . [and] . . . define and detail how the proposed Transition Plan [would] reduce impact to current schedules, and detail how and when the offeror will have processes and procedures in place.

AR 238. Plaintiff's attempt to unearth another inconsistency in Cubic's transition plan based upon the assignment of transition tasks to direct, as opposed to overhead, employees is not supported by the record. There is no "technical" problem or inconsistency with Cubic's ability to perform transition based upon the direct or overhead status of its employees.

## Plaintiff Did Not Establish that the Agency Misevaluated Cubic's Transition Costs

A-TS asserts that DTRA failed to understand that Cubic's cost proposal for transition was unrealistic, relying on its own comparison of Cubic's cost proposal with Cubic's technical proposal. A-TS argues that Cubic's cost proposal was unrealistic because Cubic proposed no costs for transition while appearing to assign many staff members to transition in its technical proposal. Pl. Mot. 13-15. That Cubic proposed charging zero hours for its transition effort in its cost proposal does not invalidate its technical proposal. The SOW for each Sample Task Order required that "[a]ny and all transition costs shall be proposed and accumulated discretely" under CLIN 0001. AR 251, 284, 338. For CLIN 0001, in every applicable table and chart in its cost proposal, Cubic indicated that it was charging $0 for all transition efforts, including direct labor. See, e.g., AR 2047.

---

[6]     The parties base their arguments on the transition plan in Sample Task Order 1.

Indeed, Cubic's proposal reiterated that it would charge $0 for transition in several instances:

- "We have not proposed costs for transition.  The required transition tasks will be performed by our indirect staff."  AR 1998.
- "The required transition tasks will be performed by our indirect staff, therefore CLIN 0001 is $0.  Please refer to Paragraph 14.4 below and Volume II, Section 1.0: Sample Tasks, pages 1-3 of each."  Id.
- "CAI, along with the subcontractors, have not priced a Transition Period.  As described in Volume II, Section 1.0: Sample Tasks, pages 1-3 of each, the efforts required during the transition period will be performed by employees assigned to our indirect rate pools."  AR 2009.
- $0 for transition was represented on Cubic's charts and labor hour summaries for each Sample Task Order.  AR 2459, 2478,  2495.
- "In no case do we anticipate charging new employee labor to the transition CLIN. Administrative and training actions in preparation for performance will be at no cost to the Government."  AR 1687, 1829.

As Cubic represented numerous times in its proposal that there would be no cost for transition, the risk for a no-cost transition remained exclusively on Cubic.  Cubic could not charge for transition when it affirmatively represented multiple times in its proposal that it would not.  Contractors are permitted to absorb costs in their proposals.  Where the contractor undertakes such a business judgment, the Government is not required to adjust the contractor's proposal to account for the absorbed costs.  See In Re Science Applications, Int'l Corp., B-232548, 1989 WL 240237 at *14 (Comp. Gen. Jan. 23, 1989).

A-TS attempts to create another inconsistency by arguing that Cubic's cost proposal stated that it would not charge for transition only because it would be using indirect employees, while its technical proposal stated that some direct employees would work on transition.  This argument is a red herring.  The language and charts in Cubic's proposal make clear that no matter what type of employee would work on transition, Cubic would not charge the Government for this effort. A-TS might have a point if despite offering no-cost indirect employees for transition, Cubic's proposal inconsistently slipped in costs for some direct employees or was unclear about what it was charging for transition efforts of direct employees.  This is not the case here.  While Cubic's cost proposal did reference its use of indirect employees in discussing its no-cost transition, it consistently and repeatedly assured the Government that there would be no cost for transition.  Contrary to A-TS' suggestion, there is no basis in Cubic's proposal to infer that there would or could be a cost for any direct employees' transition efforts.  The Agency did not err in its evaluation of Cubic's transition cost.

## The Agency Did Not Treat A-TS Unequally in the Technical Evaluation

A-TS argues that DTRA treated it unequally in the technical evaluation by failing to award it certain strengths and by assigning it a weakness in evaluating its Sample Task Order 3 when taking corrective action.  Pl. Mot. 24-31.  In essence, Plaintiff asks the Court to reevaluate its proposal.  In this endeavor, Plaintiff faces an uphill battle.  This Court does not sit as a super source selection authority to second guess and re-score offerors' proposals. Rather, it is well established that the Court should not substitute its judgment to assess the relative merits of

competing proposals in a government procurement.  AshBritt, Inc. v. United States, 87 Fed. Cl. 344, 367 (2009) clarified by, amended by AshBritt, Inc. v. United States, 87 Fed. Cl. 654 (2009) (citing R & W Flammann GMBH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (internal citations omitted)).

The FAR requires "integrity, fairness, and openness" in procurements and prohibits Government personnel involved in the acquisition from engaging in conduct that favors one offeror over another.  See CMI Mgmt. v. United States, 115 Fed. Cl. 276, 300 (2014) (citing 28 C.F.R. § 1.102(b)(3); 28 C.F.R. § 15.306(e)(1)).  "The agency's failure to follow the terms of its own Solicitation and selection of an offeror based upon different requirements than those imposed upon the only other offeror are quintessential examples of conduct which lacks a rational basis."  Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273 (2004).  Contracting officers are obligated to treat all offerors equally, "evaluating proposals evenhandedly against common requirements and evaluation criteria."  NCL Logistics Co. v. United States, 109 Fed. Cl. 596, 626 (2013) (quoting Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 383 (2003), aff'd 365 F.3d 1345 (Fed. Cir. 2004); 48 C.F.R. § 1.602-2).  Indeed, "an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." Id. (quoting Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996)).  However, offerors who are not similarly situated may be treated differently.  See NCL Logistics Co., 109 Fed. Cl. at 626.

### Cubic Was Properly Given a Strength for International Logistics

A-TS failed to demonstrate that DTRA should have considered its technical proposal on international logistics to be equal to Cubic's.  DTRA awarded Cubic a Management Approach strength for its thorough approach to international logistics, finding it was doing business in over 85 countries, regularly using local nationals as employees in foreign countries, and negotiating vendor agreements in support of international operations.  AR 3438.  The benefits of this strength to the Government were a strong likelihood of cost savings, streamlining logistic requirements through existing relationships, and offering reliable quality.  Id.

A-TS asserts that DTRA misunderstood and "implicitly re-wrote Cubic's proposal to include benefits that the Agency valued but that Cubic did not actually offer" because the proposal did not fully list the 85 countries and did not state that Cubic planned to use these existing local national vendor relationships.  Pl. Mot. 25.  This argument is devoid of merit. Cubic actually tied its work in 85 countries to this solicitation requirement, while A-TS' Subfactor A – Management Approach did not contain a description of how its international presence would help it manage the contract.  In its Management Approach, under the subheading "1.1.6.1.1 Technical Performance Requirements [SOO 4.2 a. – h.]," Cubic represented that it was currently performing "all Technical Performance Requirements (TPR) as specified in SOO paragraph 4.2 on our current incumbent contracts."  AR 1666.  Cubic then stated that it was providing "[a] brief overview of the processes we use to perform these requirements . . . ."  Id. In a section within subheading 1.1.6.1.1 labeled "In-Country Logistical Support [SOO 4.2.e]," Cubic described the work its subcontractors would do to provide in-country logistical support and concluded that "[i]n addition, both Cubic and [a subcontractor] are large multinational companies doing business in over 85 countries with offices throughout the world. We regularly employ local national employees and negotiate vendor agreements in support of international operations."  AR 1667.

A-TS also argues that its own proposal "was plainly superior in this area" because it "explained that its overseas reach involves work specifically relevant to this contract" in 45 different countries, and "identified its key overseas locations and pledged those locations to support this contract." Pl. Mot. 25-26.   A-TS points out a variety of places in its proposal where it referred to its international activities in 45 different countries. Pl. Mot. 26 (citing AR 763, 800, 875, 808, 780). However, only one mention of "45 countries" was in A-TS' Subfactor A – Management Approach, contained in a general description of A-TS in its identification of prime and subcontractors.  AR 763.[7]  In its Management Approach section on Offsite Facilities, A-TS listed 16 international cities that were available to support program operations.  AR 780. Other mentions of A-TS' international presence were contained in its Technical Approach as part of its description of how it would perform the Sample Task Orders.

In sum, based on the difference in the offerors' proposals, it was reasonable for DTRA to conclude that Cubic's international experience would aid international logistics during contract performance and award Cubic, but not A-TS, this strength for Subfactor A – Management Approach.

### DTRA Properly Evaluated A-TS' Innovation And Relevancy Toolkit

A-TS argues that DTRA improperly failed to assign it a strength for its Innovation and Relevancy Toolkit in its Subfactor A – Management Approach.  Pl. Mot. 30.  In order to merit a strength, the proposed item had to "exceed[] specified performance or capability requirements in a way that [would] be advantageous to the Government during contract performance."  AR 239.

A-TS' Innovations and Relevancy Toolkit was a

[***]

 AR 768.  A-TS described how it would "plan, coordinate and track the preparations and phased development/re-deployment of personnel deployed OCONUS in support of operations in high-risk, hostile areas."  Id.  Neither A-TS nor Cubic received a strength or a weakness for this technical element.

A-TS asserts that its toolkit deserved a strength "based on the toolkit's breadth and the ability of an online platform to quickly share information among the various parties."  Pl. Mot. 30.  A-TS further argues that if all offerors were required to propose a way to track personnel and inventories and A-TS' toolkit merely met this requirement, then Cubic should have been awarded a weakness for its inferior "paper course catalogue" and "annual, serialized inventory" of property.  Id. at 30-31 (citing AR 3070, 1660, 1667).

Here, in the context of specialized training to counter chemical, biological, or nuclear attacks or accidents, the Agency is in a far better position than the Court to assess how advantageous A-TS' Innovation and Relevancy Toolkit would be to the Government during contract performance.  This Court is not about to second-guess which offeror's tracking system was superior for the Agency's purposes or engage in the exercise of rescoring technical

---

[7]     AR 763 was a list of "team members, business size, role, anticipated areas of Statement of Objectives responsibility, sample [Task Order] alignment, and value they bring to the DTRA BPC program." AR 762.  AR 763 listed A-TS as the prime contractor.

proposals.  See AshBritt, Inc., 87 Fed. Cl. at 367.  Rather, the Court affords deference to agency determinations on technical matters, in recognition of the special expertise of procurement officials.  AM Gen., LLC v. United States, 115 Fed. Cl. 653, 677 (2014) (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); J.C.N. Constr., Inc. v. United States, 107 Fed. Cl. 503, 510 (2012); Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005)). Technical ratings involve discretionary decisions of procurement officials that the Court will not second guess.  E.W. Bliss Co., 77 F.3d at 449.

### The Agency Did Not Treat A-TS Unfairly In Taking Corrective Action

When examining agency corrective action, the Court considers whether the corrective action was "reasonable under the circumstances."  See, e.g., Sierra Nev. Corp. v. United States, 107 Fed. Cl. 735, 750 (2012); Sheridan Corp. v. United States, 95 Fed. Cl. 141, 151 (2010); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 65 (2001).  A-TS argues that the weakness that it received for Sample Task Order 3 after the Agency's corrective action was both unreasonable and evidence of disparate treatment.  Pl. Mot. 26.  As a general matter, A-TS contends that this weakness resulted from an illegal "second scrub for weaknesses performed on [A-TS'] – and only [A-TS'] – proposal."  Id. at 27.  Contrary to A-TS' assertion, the record shows that as part of the corrective action, the Agency reconsidered all offerors' proposals.  As the SSEB's post-GAO brief indicates, all offerors were afforded an opportunity to be reconsidered, and the Mission Capability Evaluation Team "researched issues, conducted re-evaluation and made revisions to record as appropriate."  AR 3300.  This is reflected in the post-protest review for Cubic's Subfactor B – Technical Approach, where the Agency removed Cubic's strength for travel costs that had been questioned by GAO. AR 3313.

A-TS further argued that the Agency created a new weakness in taking corrective action, while Cubic and the Government contend that the Agency "reworded" a weakness identified in GAO's outcome prediction.  The original weakness assigned to A-TS' proposal and risk as compared to the reworded weakness and risk are as follows:

| Original Weakness and Impact/Risk | Reworded Weakness and Impact/Risk |
|---|---|
| Offeror has one individual whose hours exceed 1 FTE (352 for CLIN 1; 1880 for CLIN 2) without explanation (STO 3 – page 59) | Offeror provided an inconsistent staffing plan for Transition. The Senior Exercise Planner is proposed to work 544 hours during transition (page 194 para 1.1 Transition) however, in Exhibit 73 (page 167) the Senior Exercise Planner is not identified and instead the hours are divided between Program Analysts. |
| Government is uncertain why one individual is exceeding 1 FTE hours | Because of the inconsistency in the proposal the Government doesn't understand the transition staffing and [sic] proposed transition tasks would be accomplished |

18

AR 3345-46. The original weakness questioned why a Senior Exercise Planner's hours exceeded 1 FTE.[8] The new weakness questioned the hours of this same Senior Exercise Planner and asked why he was designated as working 544 hours during transition in one area of the proposal but not in another. Both the old and reworded weakness concern the same person and the same hours, and the amplified explanation of this weakness was reasonable, and not the result of a different standard being applied to A-TS.

A-TS further contends that in articulating this weakness, the Agency expressed a concern about the hours of A-TS' Senior Exercise Planner that had "no basis in fact," and ignored Cubic's inconsistent transition staffing. Pl. Mot. 28-29. The Court concludes that the record supports the Agency's finding of an inconsistency and weakness in A-TS' transition proposal. On page 194 of A-TS' proposal, under the heading "Project Management," "1.1 Transition" was described as follows:

> Transition is 60 days. Team A-TS leadership will initially coordinate with incumbent and customer, identify and develop processes/Project management plan, and then staff will continue to implement. TO Pjm (352 hours) + 5 Regional Leads + (1760 hours) + Senior Exercise Planner (544 Hours) + Logistician (272 Hours) = (2928 Total Hours).

AR 946. However, A-TS' Exhibit 73 on page 167 of A-TS' technical proposal depicted "the ramp-up of [Task Order] staff through the transition" but did not mention the Senior Exercise Planner. Instead, 272 hours each were assigned to a Senior Program Analyst and a Program Analyst. AR 919. The charts for A-TS' Sample Task Order 3 transition staffing allocation and cost proposal did not show the hours of the two program analysts described in its Exhibit 73. AR 947, 1198. Thus, the Agency reasonably concluded that there was an inconsistency regarding who would perform these 544 hours of work during transition.

A-TS also argues that it was treated unequally because it received this weakness for inconsistent transition staffing, while Cubic did not receive any weaknesses for the alleged inconsistencies in its transition plan. Pl. Reply 22-23. However, the parties are not similarly situated in this regard, because A-TS' proposal had an inconsistency, but Cubic's did not. See NCL Logistics Co., 109 Fed. Cl. at 627 (holding that offerors who are not similarly situated may be treated differently). In A-TS' proposal, an individual was listed as performing specified hours in one part of the proposal, but these hours were inconsistently assigned to other employees in another part of the proposal. In contrast, Plaintiff has not demonstrated that there was an inconsistency in Cubic's proposal due to its $0 cost for transition and its use of both indirect and direct employees.

**DTRA Reasonably Assigned A-TS' Proposal a Weakness for On-Site Staffing**

A-TS argues that DTRA irrationally awarded it a weakness for its on-site staffing. As part of the Subfactor B – Technical Evaluation for Sample Task Order 2, DTRA gave A-TS a weakness which stated "[t]he Offeror's proposal increases the on-site presence for the On-Site Operational Support and FBI Program Liaison positions (Task 3.1; Task 3.2)." AR 3392. The

---

[8]     The only individual having more than 1 FTE hours on page 59 of Sample Task Order 3 was Senior Exercise Planner [***].

associated impact/risk was stated to be "Government cannot accommodate additional on-site presence other than what is indicated in the SOW." Id. The related solicitation provisions stated:

> 6.1. The contractor shall provide one (1) FTE on-site for operational support to ICP J3BPPC office throughout the period of performance as required to assist in planning and execution of ICP program requirements as well as facilitate requirements coordination and communication with ICP partnering elements within DTRA; . . . .
>
> 6.3.1. The contractor shall provide part-time, on-site support at the FBI International Operations Division (IOD) to plan, formulate, execute, monitor, and measure ICP program requirements and implementation support with the FBI as well as facilitate the required coordination and communication between J3BPPC and the FBI IOD.

AR 292-93.

A-TS' proposal stated that the Task Order project manager and the Senior Program Analyst would support the ICP J3BPP office and that the Senior Program Analyst would serve as the DOD/FBI Liaison Officer. AR 890-91. When describing its staffing, A-TS stated that on-site operational support (Task 3.1) would be done by a Program Analyst for 2940 total hours and the DOD/FBI Program Liaison Support (Task 3.2) required "one FTE for two different areas," consisting of "To Pjm (125 hours) + Senior Program Analyst (1870 hours) + 960 Program Analyst – 2955 Total Hours." AR 896.

It was reasonable for DTRA to award A-TS a weakness for its proposed staffing levels for these positions. While the solicitation specified one FTE for the ICP J3BPP on-site office and part-time support for the on-site FBI liaison office, A-TS proposed hours well beyond one FTE (1880 hours) for both roles, because ATS proposed that Task 3.1 would be done by a Program Analyst for 2940 hours and Task 3.2 would be shared by three individuals for 2955 hours. A-TS' current argument that individuals working in these roles could have been employed off-site or could have worked on-site when the Government requested their presence was not included in A-TS' proposal. See Pl. Mot. 32-33.[9]

---

[9]     In its reply, A-TS raises a new argument that Cubic should have received a similar weakness because Cubic proposed [***] as its "DTRA on-site liaison in planning and execution of ICP J3BPPC reqs" for 1915 hours, also more than 1880 hours. Pl. Reply 24. However, A-TS misinterprets Cubic's proposal. Cubic did not propose that [***] would only spend 1915 hours as the on-site liaison. His full job description was:

> Serve as DTRA on-site liaison in planning and execution of ICP J3BPPC reqs. Facilitate communication with interagency affiliates.
>
> Maintain ICP Dashboard schedule, administrative records, document meetings. Support unforeseen short-notice tasking.

**The Agency Reasonably Assigned A-TS a Weakness for Senior Program Analyst Responsibilities**

A-TS argues that it should not have been assigned a weakness for Subfactor B – Technical Approach in Sample Task Order 2 for an alleged discrepancy between its Execution Plan and Staffing Plan in explaining the responsibilities of the Senior Program Analyst. Pl. Mot. 33.

This weakness stated:

> The Offeror's Staffing Plan lists the Senior Program Analyst as solely providing full time on-site support at the FBI. Offeror's Execution Plan assigns the Senior Program Analyst additional responsibilities not listed in the Staffing Plan. (3.2.3; 3.2.9.1; 3.2.9.3).

AR 3392. The associated impact/risk was "Government is uncertain as to the scope of the Senior Program Analyst's responsibilities." Id.

A-TS asserts that there was no discrepancy. Pl. Mot. 33. However, as DTRA noted, the record shows that A-TS inconsistently described the Senior Program Analyst's role across different parts of its technical proposal. A-TS' Execution Plan at section 3.2.3 stated that "[t]he Senior Program Analyst [would] lead the ICP portal management throughout the life cycle of course content and engagement." AR 877. The Senior Program Analyst was also described as an "ICP Portal stakeholder." Id. However, in ATS' Execution Plan section 3.2.9.1, the Senior Program Analyst and the TO Pjm were described as part of the on-site operational support to the ICP J3BPP office. AR 890. Furthermore, in Execution Plan section 3.2.9.3, the Senior Program Analyst was described as serving as the "DOD/FBI ICP program Liaison Officer," ensuring that "all ICP events are coordinated and documents are properly staffed through both the J3BPP and the FBI IOD." AR 891. As part of this role, the Senior Program Analyst would "help the FBI IOD plan, formulate, execute, monitor and measure the ICP program requirements as well as facilitate and coordinate between the DOD, DTRA, and FBI." Id.

A-TS' Exhibit 68 to its proposal, which broke down job roles by hours, assigned the Senior Program Analyst 352 hours for transition, 10 hours for ICP curriculum development and revision, and 1870 for the DOD/FBI Program liaison support. AR 894. A-TS' Staffing Plan referred back to this Exhibit but described the scope of the Senior Program Analyst's work as

> Provide onsite support to the FBI International Operations Division (IOD) to plan, formulate, execute, monitor, and ensure ICP requirements and implementation support. Maintain close liaison with the FBI WMD Directorate and in country legal attaches. Provide curriculum review, development, and oversight. Facilitate and coordinate communication between J3BPPC and FBI IOD.

AR 906. This Staffing Plan thus did not mention the Senior Program Analyst's role in leading ICP portal management or his role in the on-site J3BPPC office.

---

AR 1813.

The Agency's articulation of this weakness contained an error -- the Staffing Plan did not list the Senior Program Analyst as "solely" providing full time on-site support to the FBI, but referenced Exhibit 68, which showed that the Senior Program Analyst would spend 10 hours on ICP curriculum development and revision.  See AR 894, 906.  However, despite this inaccuracy, the weakness correctly identified that the Execution Plan listed additional responsibilities for this position not included in the Staffing Plan.  DTRA's error in not acknowledging the 10 hours for ICP curriculum development and revision does not invalidate its identification of the differing responsibilities A-TS gave to the Senior Program Analyst across different areas of its proposal.  The different Execution Plan sections described a broader scope of the role of the Senior Program Analyst than was evident from the Staffing Plan, which was confined to describing the work of the Senior Program Analyst while performing as the DOD/FBI liaison.

In any event, A-TS was not prejudiced by its receipt of this weakness for Subfactor B – Technical Approach Sample Task Order 2.  A-TS received an "outstanding" rating for Subfactor B – Technical Approach, and removing this weakness could not have improved its rating.  This weakness was not mentioned in either the pre- or post-GAO protest SSA decision and thus did not appear to tip the balance in favor of Cubic.  See AR 2751, 3294.

### DTRA's Best Value Decision Was Reasonable

Procurement officials have substantial discretion to determine which proposal represents the best value for the government.  E.W. Bliss Co., 77 F.3d at 449.  Here, the SSA acted well within his discretion to decide that while A-TS' and Cubic's proposals were roughly equal, Cubic's proposal provided certain desired advantages, and Cubic's [***] lower cost made Cubic's proposal a better value to the Government.

### Conclusion

The Court **DENIES** Plaintiff's motion for judgment on the AR and motion for injunctive relief.  The Court **GRANTS** Defendant's and Intervenor's cross-motions for judgment on the AR.  The Court directs the Clerk to enter judgment accordingly.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**